**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHELLE KRACKER, | ) | |
| | ) | CASE NO. 5:08-cv-01905 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE PETER C. ECONOMUS |
| | ) | |
| MICHAEL J. ASTRUE, | ) | MAGISTRATE JUDGE GREG WHITE |
| Commissioner of Social Security | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Michelle Kracker ("Kracker") challenges the final decision of the Commissioner

of Social Security, Michael J. Astrue ("Commissioner"), denying her claim for a Period of

Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, *et seq*.  The Court has jurisdiction pursuant to 42

U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to

an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

For the reasons set forth below, the Magistrate Judge recommends that the final decision

of the Commissioner be AFFIRMED.

**I. Procedural History**

On August 18, 2005, Kracker filed an application for POD and DIB alleging a disability

onset date of October 23, 2003 and claiming that she was disabled due to back injuries and pain.
(Tr. 78-79.)  Her application was denied both initially and upon reconsideration.  Kracker timely
requested an administrative hearing.

On February 6, 2008, Administrative Law Judge Mark M. Carissimi ("ALJ") held a
hearing during which Kracker, represented by counsel, testified.  Frank Cox, M.D., testified as
the medical expert ("ME") and Deborah Lee testified as the vocational expert ("VE").  On
March 21, 2008, the ALJ found Kracker was able to perform a significant number of jobs in the
national economy and, therefore, was not disabled.  The ALJ's decision became the final
decision of the Commissioner when the Appeals Council denied further review.

On appeal, Kracker claims the ALJ erred by: (1) finding that she was capable of
performing a range of light work; and (2) "devising an incomplete mental residual functional
capacity."  (Doc. No. 10.)

## II.  Evidence

### Personal and Vocational Evidence

Born on October 19, 1966 and age thirty-nine (39) at the time her insured status expired,
Kracker is a "younger" person.  *See* 20 C.F.R. § 404.1563(c).  Kracker has a high school diploma
and past relevant work as an office clerk and dispatcher.

### Medical Evidence

On October 23, 2003, Kracker was involved in a motor vehicle accident and reported to
an emergency room (ER) where she was diagnosed with cervical and myofascial lumbar strain.
(Tr. 172-74.)  Shortly after the accident, she began to experience neck and back pain.  (Tr. 172.)
X-rays of her cervical spine showed no significant abnormalities.  (Tr. 174.)

On November 5, 2003, Kracker was seen by J. Douglas Yeakel, M.D., who ordered a magnetic resonance imaging (MRI) scan.  (Tr. 179-80.)  Dr. Yeakel prescribed therapy, Mederol and Flexeril.  *Id*.

On November 13, 2003, an MRI of Kracker's lumbar spine revealed mild disc degeneration with a mild central disc bulge at L4-5, which was contacting but not significantly deforming the thecal sac.  (Tr. 175.)

On November 17, 2003, Kracker indicated that she experienced nocturnal leg pain.  (Tr. 178.)  Dr. Yeakel noted mild tenderness of the sciatic notch, tenderness in the right sacroiliac joint, and diagnosed lumbar sprain/strain.  *Id*.  She was instructed not to return to work for two weeks.  *Id*.

On December 1, 2003, Kracker told Clifford Merz, a physical therapist that she did not feel that physical therapy had been beneficial.  (Tr. 177.)  She did indicate that using a heating pad helped.  *Id*.  Merz observed negative straight leg raising, normal range of motion in the hips, tenderness in the sacroiliac joints, and positive femoral stretch.  *Id*.

On December 15, 2003, Kracker complained to Dr. Yeakel of numbness and tingling in the right leg as well as severe pain of the lower right back.  (Tr. 176.)  Dr. Yeakel observed mild hypoasthesia of the "mid medial aspect of the left leg."  *Id*.  He discussed various treatment options, including conservative treatment with physical therapy, referral to a back surgeon, and epidural injections.  *Id*.

On December 17, 2003, Kracker underwent an electromyogram (EMG), which showed no signs of nerve root compromise or entrapment.  (Tr. 181, 489-90.)

On December 19, 2003, Kracker received epidural injections at L3-4.  (Tr. 190.)  The

procedure was repeated twice during the following month.  (Tr. 186-89.)

On December 22, 2003, Kracker was seen by orthopedic surgeon Jeffrey M. Cochran, D.O., who found tenderness to palpation throughout the lumbar, sacroiliac, and gluteal regions. (Tr. 232-33.)  Straight-leg-raising caused paresthesia bilaterally both when seated and standing. *Id*.  She tested positive for Braggard's test.  *Id*.  Dr. Cochran diagnosed "[m]idline herniated nucleus pulposus L5-S1 with lumbar nerve root irritation."  *Id*.

On January 29, 2004, Dr. Cochran again examined Kracker and found that her straight leg raising tests were negative bilaterally with normal leg strength in the lower extremities.  (Tr. 231.)  After discussion, Kracker elected to undergo a lumbar discogram and surgery was scheduled.  *Id*.

On February 3, 2004, Kracker underwent a computed tomography (CT) scan of the lumbar spine, which showed that she had annular tears at L4-5 and L5-S1, with a right paracentral disc herniation demonstrated at L4-5.  (Tr. 205.)

On February 16, 2004, Dr. Cochran stated that the CT discogram did not reproduce Kracker's  back pain, and, therefore, he felt that her pain was not discogenic.  (Tr. 230.)  She did, however, appear to have "nerve root irritation secondary to a herniated nucleus pulposus."  *Id*.

On February 25, 2004, Dr. Cochran performed a microscopic intersegmental decompression bilaterally at L4-5 and L5-S1.  (Tr. 199-200.)  Dr. Cochran noted that there was no lateralizing protrusion and no disc compression on the nerve roots.  (Tr. 200.)  Therefore, he did not excise the disc.  *Id*.  He noted that there was no evidence of persistent tension or compression on the nerve roots.  *Id*.  Postoperative diagnoses were herniated nucleus pulposus, L4-5 and L5-S1; degenerative disc disease, L4-5 and L5-S1; and acquired spinal stenosis, L4-5

greater than L5-S1.  (Tr. 200-02.)

 Between March 12, 2004 and April 12, 2004, Kracker participated in thirteen physical therapy sessions with James Walker, P.T.  (Tr. 212-28.)

On April 12, 2004, Kracker returned to Dr. Cochran and complained of persistent right-leg pain.  (Tr. 240-41.)  She was scheduled for a right sacroiliac joint injection.  *Id.*

On April 26, 2004 and June 21, 2004, Kracker received additional right sacroiliac joint injections.  (Tr. 195-98, 238.)

Kracker resumed physical therapy with Mr. Walker in June and July of 2004.  (Tr. 211, 218-19, 221, 223-24.)  Afterwards, Kracker continued to complain that "activities such as working in her yard or doing any prolonged activities including sitting, standing, or walking cause[d] increased symptoms."  (Tr. 210.)

On July 26, 2004, Dr. Cochran referred Kracker to Vladimir Djuric, M.D., noting that she had undergone extensive treatment including physical therapy, lumbar epidural injections, lumbar discogram, and intersegmental decompression at L4-5 and L5-S1, two sacroiliac joint injections, and additional physical therapy.  (Tr. 229.)

On September 16, 2004, Dr. Djuric examined Kracker and found she had full range of motion in her neck, without muscle tenderness or trigger points, and full range of motion in her upper extremities.  (Tr. 277-79.)  She had a moderate restriction of her lumbar range of motion, but she had good range of motion in her hips.  *Id.*  Straight leg raising tests were negative.  *Id.* She had normal balance, normal reflexes, no focal motor deficits, and was able to walk on her heels and toes.  *Id.*  She was able to do a full squat with minimal to moderate discomfort.  *Id.*  He also noted tenderness to palpation from L4 through S1, pain provocation on lumbar

5

range-of-motion testing, tenderness along the medial iliac crest and posterior superior iliac spine, positive Gillette's and Patrick's testing, and hypersensitivity to pinprick testing of the right lower extremity.  *Id*.  Dr. Djuric included piriformis syndrome and tochanteric bursitis as additional considerations.  (Tr. 279.)

On September 28, 2004, Kracker received a series of sacroiliac joint injections.  (Tr. 275-76.)

On October 25, 2004, Cindi Hill, M.D., a state agency physician, reviewed Kracker's medical records and completed a Residual Functional Capacity ("RFC") Assessment form.  (Tr. 261-68.)  Dr. Hill indicated that Kracker retained the capacity to perform light work that did not require climbing ladders, ropes, or scaffolds, and required no more than occasional climbing of ramps and stairs, stooping, kneeling, crouching, and crawling.  (Tr. 262-63.)

On October 27, 2004, Dr. Djuric noted moderate restriction in mobility and diagnosed lumbosacral dysfunction.  (Tr. 273.)  He observed minimal improvement from the sacroiliac joint injections.  *Id*.  Though finding there was a "[c]linical presentation suggest[ing] a component of radicular pain/radiculitis ... in all likelihood there is a component of central sensitization with associated sleep disturbance."  *Id*.  He replaced her Prozac with Cymbalta and prescribed Doxepin to help sleep.  *Id*.  On November 2, 2004, Dr. Djuric administered selective nerve root block injections at right L5, left S1, and right S1.  (Tr. 270-72.)

On January 12, 2005, Kracker was seen by Keith Werstler, M.D., and complained of back pain and depression.  (Tr. 362-64.)  She reported that, at times, she would not leave the house due to her depression, lack of energy, increased pain, increased weight, and low self-image.  *Id*.  Dr. Werstler planned to wean Kracker off Cymbalta and onto Effexor.  *Id*.

6

On February 1, 2005, Robert M. Felden, D.O., a pain management specialist, examined Kracker and evaluated her functioning. (Tr. 349-52.)  Dr. Felden found that Kracker's straight leg raising was negative, but there was muscle tenderness and spasms present in her lower back region.  (Tr. 351.)  Dr. Felden reviewed an MRI and found it showed no focal disc herniation, canal stenosis or foraminal narrowing.  *Id.*  He diagnosed low back pain with right lower extremity radiculopathy and prescribed Robaxin and Diclofenac sodium.  *Id.*

On February 24, 2005, Jean Claude Tabet, M.D., examined Kracker at the request of Dr. Djuric.  (Tr. 192-94, 269.)  Dr. Tabet, a neurologist, reported that Kracker complained of back pain and right lower extremity pain.  (Tr. 192-94.)  Dr. Tabet found Kracker had a normal gait, no significant low back tenderness to palpation, positive straight leg raising on the right but negative on the left, and normal gross motor, sensory and cerebral testing.  (Tr. 198.)  He recommended Kracker undergo an MRI with gadolinium, an electromyelogram, and x-rays.  (Tr. 199.)

On March 11, 2005, Dr. Felden reviewed Kracker's recent x-rays and found no significant abnormalities.  (Tr. 475-78.)

On March 21, 2005, a lumbar myelogram revealed mild posterolateral extradural defect on the right side of the thecal sac.  (Tr. 473.)  Kracker had a slight disc bulge not involving the neural foramina.  *Id.*  Asymmetrical under-filling of the right L5 nerve root was also noted.  *Id.*

On April 25, 2005, Dr. Felden administered a lumbar epidural injection.  (Tr. 343.)  Kracker told Dr. Feldon that she took her medications intermittently and did not follow a daily regimen.  *Id.*

On June 23, 2005, Scot Miller, D.O., an orthopedic surgeon, examined Kracker and

7

found that she had a normal gait, including heel and toe walking.  (Tr. 297-98.)  Dr. Miller

reviewed an MRI of Kracker's lumbosacral spine and noted that it showed a relatively

well-preserved disc space height at L4-5 and L5-S1 with mild central disc bulge at L4-5.  *Id.*  He

recommended a lumbar discogram.  *Id.*

On July 7, 2005, Kracker underwent a lumbar discogram, which revealed pain responses

on injection of L4-5 and L5-S1, grade V posterior L4-5 radial tear with concurrent disc bulge

lateralizing towards the right, and a grade III tear at L5-S1 abutting but not displacing the right

S1 nerve root sleeve or thecal sac.  (Tr. 471-72.)

On July 15, 2005, Kracker reported that standing on her feet for long periods of time

increased her edema.  (Tr. 336.)  Dr. Felden noted a slight edema in the lower extremities.  *Id.*

On August 2, 2005, Dr. Miller noted Kracker's discogram had revealed painful

concordant responses on injection of both L4-5 and L5-S1.  (Tr. 296.)  He discussed surgical

options with Kracker.  *Id.*

On August 4, 2005, state consultative psychologist John S. Quinn, Ph.D., evaluated

Kracker and diagnosed depressive disorder not otherwise specified; pain disorder associated with

both psychological factors and a general medical condition; back pain; and assigned a Global

Assessment of Functioning ("GAF") scale score of 60.[1]  (Tr. 323-27.)  He found moderate

limitation in the ability to relate to others, including fellow workers and supervisors; minimal

limitation in the ability to understand, remember, and follow instructions; minimal limitation in

---

[1]  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in
social, occupational, or school functioning.  A person who scores in this range may have a flat
affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  *See
Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association,
4th ed. revised, 2000).

8

the ability to maintain concentration, persistence, and pace to perform simple, repetitive tasks;
and moderate limitation in her ability to withstand the stress and pressures associated with daily
work activity typical of an eight-hour day, forty-hour workweek.  (Tr. 327.)

On September 8, 2005, Mark Cecil, M.D., completed a form indicating that Kracker was
totally disabled from work from November 29, 2005, the day her lumbar discectomy would be
performed, until February 21, 2006.  (Tr. 429.)

On November 29, 2005, Dr. Cecil performed a lumbar discectomy with fusion
and screw placement.  (Tr. 367-78.)  Kracker was discharged from the hospital on December 4,
2005.  *Id*.

On January 10, 2006, Dr. Werstler completed a form provided by the Bureau of
Disability Determination.  (Tr. 376-78.)  He noted Kracker had received the following treatment:
physical therapy, pain management, medication, epidural injections, and two surgeries.  *Id*.  He
opined that Kracker had limited ability to stoop, lift, bend, push, and pull.  *Id*.  This condition
prohibited any kind of physical labor.  *Id*.  He further stated that she was able to sit for only
fifteen to thirty minutes due to pain.  *Id*.  He recommended that information be obtained from
Kracker's surgeons and pain management doctors.  *Id*.

On January 26, 2006, state reviewing consultant Esberdado Villanueva completed an
RFC Assessment.[2]  (Tr. 379-86.)  He opined Kracker could lift fifty pounds occasionally and
twenty-five pounds frequently; stand, walk, or sit about six hours each in a workday;
occasionally climb ramps or stairs, stoop, crouch, or crawl; and never climb ladders, ropes, or

---

[2]  The RFC form lacks a hand-written signature or any indication of Villanueva's credentials.
(Tr. 386.)

scaffolds.  *Id.*

Also on January 26, 2006 state reviewing examiner Jennifer Swain completed a

Psychiatric Review Technique form and a Mental RFC Assessment.[3]  (Tr. 387-405.)  Based on

affective and somatoform disorders, Swain found Kracker did not meet or equal a listed

impairment.  (Tr. 397.)  Swain found that Kracker had a mild restriction of activities of daily

living, moderate restrictions in maintaining social functioning, and mild limits on concentration,

persistence, and pace.  *Id.*  She also could interact appropriately with familiar others in a small

setting but could not be expected to handle complaints or sustain ongoing contact with the

public.  (Tr. 403.)  She noted that Kracker's allegations were credible in nature but not in

severity of limitation or functioning.  *Id.*  She concluded Kracker "can sustain routine tasks in a

setting where duties are relatively static and stressors are not extreme."  *Id.*

On February 14, 2006, a few months after her surgery, Kracker told Dr. Werstler that she

had been "doing a lot better until last week when she decided to try and mop the floor and that

set her back quite a bit."  (Tr. 407.)

On March 9, 2006, Dr. Werstler offered a second functional capacity opinion.  (Tr. 408-

10.)  He opined that Kracker could lift and carry less than ten pounds occasionally, stand and

walk about two hours a day, and sit less than two hours a day.  *Id.*  He further indicated that

Kracker required a sit/stand at-will option.  *Id.*  He further indicated that Kracker could never

twist or climb ladders, but could occasionally stoop, bend, crouch, or climb stairs, though only

"very little."  (Tr. 409.)  She also had limited abilities to reach, handle, push, and pull.  *Id.*  Dr.

_____

[3]  These forms also lack a hand-written signature or any indication of Swain's credentials.  (Tr. 387-405.)

10

Werstler opined that Kracker would miss more than four days of work per month due to her impairments and treatment.  (Tr. 410.)

On April 28, 2006, Dr. Cecil assessed Kracker's RFC and found she could lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk two hours, and sit less than two hours in an eight-hour workday.  (Tr. 412.)  Dr. Cecil assessed a sit-stand option, and a need to lie down at unpredictable intervals throughout the workday.  (Tr. 412-13.)  The doctor indicated she could never climb ladders, but could occasionally twist, stoop, bend, and crouch.  *Id*.  Her abilities to push and pull also were limited and she would miss approximately four days of work per month due to her impairments.  *Id*.  Dr. Cecil's report indicated that Kracker had these limits since October 23, 2003.  (Tr. 414.)

On June 2, 2006, Dr. Cecil continued to treat Kracker and released her to return to work without any limitations.  (Tr. 417.)

On June 12, 2006, Elizabeth Das, a state agency consultant, reviewed Kracker's medical records and completed a Physical RFC Assessment.[4]  (Tr. 430-37.)  Das indicated that Kracker could perform light work, with an ability to lift, carry, push and pull up to twenty pounds occasionally and ten pounds frequently, sit for six hours, and stand and/or walk for six hours.  (Tr. 431.)  She could never climb ladders, ropes, or scaffolds, and only occasionally stoop, crouch, and crawl.  (Tr. 432.)

***Hearing Testimony***

At the hearing, Kracker testified to the following.  She has not been able to work since

---

[4] The RFC form lacks a hand-written signature or any indication of Das's credentials.  (Tr. 437.)

October 23, 2003, the day she was involved in an automobile accident. (Tr. 573-74.) She was unable to do laundry, vacuum, or carry groceries after the accident. (Tr. 576-77.) On a "good day," she was able to dust and prepare simple meals. (Tr. 578.) She testified that one of the side effects of her medications was poor memory. (Tr. 581.) She does not drink alcohol or smoke cigarettes. (Tr. 583.) She has been depressed since the accident and takes Prozac. (Tr. 583.)

The ME testified that there was a "real scarcity of objective evidence" during the relevant period. (Tr. 595.) The ME noted that an EMG performed in December 17, 2003 was entirely normal and contained no evidence that would explain the presence of pain. (Tr. 595-96.) The ME also noted that a discogram performed in February 2004 did not correspond with Kracker's pain allegations. (Tr. 596-97.) He testified that Kracker's back impairments did not meet or equal the criteria of any listed impairment. (Tr. 605.) He also opined that Kracker would have been unable to work for a three-month period following each of her surgeries, but would have been able to work at the light exertional level thereafter. (Tr. 606-07.)

The ALJ asked the VE to consider a hypothetical with the following vocational abilities: a thirty-seven year old with a high school diploma; an ability to lift ten pounds frequently and twenty pounds occasionally; an ability to sit, stand, and walk for six hours each in an eight-hour work day; an ability to push or pull ten pounds frequently and twenty pounds occasionally; an ability to occasionally climb ramps and stairs; an ability to occasionally stoop, crouch, or crawl; no ability to climb ladders, ropes, or scaffolds; an inability to perform any more than routine work; and an inability to have any more than superficial interaction with co-workers and the public. (Tr. 613.) The VE responded that such a person would be unable to perform Kracker's past relevant work. *Id.* The VE, however, testified that there are other jobs in the national

12

economy a person with such limitations could perform.  (Tr. 614-16.)

Kracker's counsel asked if a person with the same aforementioned limitations, who also had to miss work twice a month due to moderate limitations in her ability to withstand the stress and pressure associated with daily work, was employable.  (Tr. 616-17.)  The VE responded that missing two days per month was approaching the "excessive" level and that such person would not be employable.  (Tr. 617.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[5]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

---

[5]  The entire five-step process entails the following: First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

13

Kracker was insured on her alleged disability onset date, October 23, 2003, and remained insured through December 31, 2005.  (Tr. 20.)  Therefore, in order to be entitled to POD and DIB, Kracker must establish a continuous twelve month period of disability commencing between October 23, 2003 and December 31, 2005.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

## IV.  Summary of Commissioner's Decision

The ALJ found Kracker established medically determinable, severe impairments, due to degenerative disc disease, depressive disorder, and pain disorder.  (Tr. 22.)  However, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Kracker is unable to perform her past relevant work activities, but has a Residual Functional Capacity ("RFC") for a limited range of light work.  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Kracker is not disabled.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular

14

conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Kracker claims the ALJ erred by: (1) finding that she was capable of performing a range of light work; and (2) "devising an incomplete mental residual functional capacity."  (Doc. No. 10.)  Each will be discussed in turn.

### *Disabling Pain*

Kracker argues that the ALJ's finding that she retained the ability to perform a range of light exertional work was not supported by substantial evidence.  (Doc. No. 10 at 14.)  The essence of her argument is that the ALJ failed to properly evaluate her allegations of pain pursuant to SSR 96-7p, which, in pertinent part, states as follows:  (Doc. No. 10 at 15-18.)

> Symptoms cannot be measured objectively through clinical or laboratory
> diagnostic techniques; however, their effects can often be clinically observed.
> The regulations at 20 C.F.R. 404.1529(c)(2) and 416.929(c)(2) provide that
> objective medical evidence "is a useful indicator to assist us in making reasonable
> conclusions about the intensity and persistence of" an individual's symptoms and
> the effects those symptoms may have on the individual's ability to function.  The
> examples in the regulations (reduced joint motion, muscle spasm, sensory deficit,
> and motor disruption) illustrate findings that may result from, or be associated
> with, the symptom of pain.  When present, these findings tend to lend credibility
> to an individual's allegations about pain or other symptoms and their functional
> effects.
>
> ***
>
> However, *allegations concerning the intensity and persistence of pain or other
> symptoms may not be disregarded solely because they are not substantiated by
> objective medical evidence*.  A report of negative findings from the application of
> medically acceptable clinical and laboratory diagnostic techniques is one of the
> many factors that appropriately are to be considered in the overall assessment of
> credibility.  However, *the absence of objective medical evidence supporting an*

> *individual's statements about the intensity and persistence of pain or other*
> *symptoms is only one factor that the adjudicator must consider in assessing an*
> *individual's credibility and must be considered in the context of all the evidence.*

***

> In general, a longitudinal medical record demonstrating an individual's attempts
> to seek medical treatment for pain or other symptoms and to follow that treatment
> once it is prescribed lends support to an individual's allegations of intense and
> persistent pain or other symptoms for the purposes of judging the credibility of
> the individual's statements.  Persistent attempts by the individual to obtain relief
> of pain or other symptoms, such as by increasing medications, trials of a variety
> of treatment modalities in an attempt to find one that works or that does not have
> side effects, referrals to specialists, or changing treatment sources may be a strong
> indication that the symptoms are a source of distress to the individual and
> generally lend support to an individual's allegations of intense and persistent
> symptoms.

> On the other hand, the individual's statements may be less credible if the level or
> frequency of treatment is inconsistent with the level of complaints, or if the
> medical reports or records show that the individual is not following the treatment
> as prescribed and there are no good reasons for this failure.

Kracker asserts that the ALJ, while employing some of the relevant criteria, relied

disproportionately on the lack of objective medical evidence.  (Doc. No. 10 at 16.)  The Sixth

Circuit has developed a two-prong test to evaluate a claimant's assertions of disabling pain:

"First, we examine whether there is objective medical evidence of an underlying medical

condition.  If there is, we then examine: (1) whether objective medical evidence confirms the

severity of the alleged pain arising from the condition; or (2) whether the objectively established

medical condition is of such a severity that it can reasonably be expected to produce the alleged

disabling pain."  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (*quoting*

*Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994)); *Duncan v. Sec'y of Health & Human*

*Servs.*, 801 F.2d 847, 853 (6th Cir. 1986); *accord Hash v. Comm'r of Soc. Sec.*, 2009 U.S. App.

LEXIS 2678 (6th Cir. Feb. 10, 2009).

16

In his decision, the ALJ found that Kracker's "medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." (Tr. 25.)  The ALJ's opinion contains a thorough and exhaustive review of the medical evidence. (Tr. 26-28.)  Essentially, the ALJ found that, despite a myriad of tests performed by many different doctors, the objective medical evidence neither confirmed the severity of the alleged pain nor did it establish that her condition was of such severity that it could reasonably be expected to produce such pain. *Id.*  Thus, the ALJ properly followed the two-prong test established by the Sixth Circuit used to evaluate a claimant's assertions of disabling pain.  Also, the ALJ's findings were not in conflict with SSR 96-7p.  While the ALJ placed a great deal of emphasis on the objective medical evidence that failed to confirm the level of pain alleged by Kracker, the dearth of such evidence was *not* the only factor considered.  The ALJ also discussed Kracker's daily activities, inconsistent statements made to physicians, failure to take her medications in the manner prescribed, inconsistent statements made in her disability application, and her husband's statement that alleged limitations significantly greater than claimed by Kracker herself.  (Tr. 27-28.)  These factors, combined with the high volume of medical testing that failed to support her allegations, are the basis of the ALJ's finding.  As such, his evaluation of Kracker's allegations of disabling pain both followed the proper procedures and were supported by substantial evidence.

***Mental RFC Limitations***

Kracker also asserts that the ALJ erred by failing to include any limitation regarding her ability to withstand the stress and pressure of work.  (Doc. No. 10 at 19.)  Specifically, Kracker

17

argues that the ALJ, while ascribing "great weight" to the opinion of state Dr. Quinn (Tr. 29), did not include any limitation that encompassed Dr. Quinn's opinion that she was moderately limited in her ability to withstand the stress and pressures associated with daily work activity typical of an eight-hour day, forty-hour workweek.  (Doc. No. 10 at 19.)  In his hypothetical to the VE, the ALJ included a limitation that restricted Kracker to no more than superficial interaction with co-workers and the public, not to include negotiation or confrontation.  (Tr. 613.)  The Commissioner asserts that this latter limitation encompassed her moderate limitation with regards to work stress and pressure.  (Doc. No. 13 at 17.)  The Court agrees.

At the hearing, Kracker's counsel defined this moderate limitation diagnosed by Dr. Quinn as being absent from work ten percent of the time or two days per month.  (Tr. 617.)  Using the definition crafted by counsel, the VE testified that such a person would not be employable.  *Id.*  Hearing counsel's position that moderate limitations in this category would result in two days of absenteeism per month appears to be speculation.  Kracker cites no rule or regulation that suggests a limitation of this degree would result in such absenteeism.  Further, Dr. Quinn's assessment does not contain any opinion as to absenteeism.[6]  (Tr. 324-27.)  The ALJ's opinion accurately included RFC limitations stemming from Kracker's mental impairments and there was no basis for including a limitation based on habitual absence for two days per month.

---

[6]  Though Dr. Werstler opined on March 9, 2005 – just over three months after Kracker's lumbar discectomy and fusion – that she would miss more than four days a month due to her impairments, the ALJ ascribed little weight to his opinion.  (Tr. 29.)  The ALJ reasoned that Dr. Werstler, Kracker's family physician, based his opinion on back problems for which he did not treat her.  *Id.*  Also, Kracker did not rely on this opinion to support her absenteeism argument while questioning the VE.

## VII.  Decision

For the foregoing reasons, the Magistrate Judge finds the decision of the Commissioner is

supported by substantial evidence.  Accordingly, the decision of the Commissioner should be

AFFIRMED and judgment entered in favor of the defendant.

s/ Greg White
U.S. Magistrate Judge

Date: May 15, 2009.


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within ten (10) days after being served with a copy of this Report and
Recommendation.  Failure to file objections within the specified time may waive the right
to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**